IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:21-cv-00057-MR-WCM

| | |
|---|---|
| WILLIAM KIMBLE, | ) |
| Plaintiff, | ) |
| v. | ) MEMORANDUM AND |
| | ) RECOMMENDATION |
| GREGORY SWINK, HUBERT CORPENING, and DAVID COTHRON, | ) |
| Defendants. | ) |

This matter is before the Court on a Motion to Dismiss (Doc. 17) by Defendants Gregory Swink ("Swink") and David Cothron ("Cothron") (collectively, the "Moving Defendants"). The Motion has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

I. **Relevant Procedural History**

On February 26, 2021, Plaintiff William Kimble, Jr. ("Plaintiff") filed his Complaint naming Swink, Cothron, and Hubert Corpening ("Corpening") as Defendants. Doc. 1.

Requests for waivers of service were sent to all three Defendants on February 26, 2021, and on April 26, 2021, executed waivers of service as to the Moving Defendants were filed. Docs. 5, 6, 7, & 13. No evidence of service as to Corpening is shown on the docket, however.

1

On July 26, 2021, the Moving Defendants filed the Motion to Dismiss along with a supporting memorandum. Docs. 17, 18. Plaintiff has responded, and the Moving Defendants have replied. Docs. 19, 20.

## II. Plaintiff's Allegations

Generally, Plaintiff's claim arises out of his placement in the Rehabilitative Diversion Unit ("RDU"), where he was allegedly "housed in solitary confinement-like conditions for approximately 400 consecutive days." Doc. 1 ¶ 3.

### A. Overview of the RDU, Restrictive Housing for Control Purposes ("Restrictive Housing"), and General Population Housing

#### 1. The RDU

Plaintiff alleges that the RDU "is a non-voluntary program described by [the North Carolina Department of Public Safety ("NCDPS")] as an alternative to long-term restrictive housing." Doc. 1 at ¶ 15. To be enrolled in the RDU, a prisoner must meet certain requirements, including having "an active control status of Restrictive Housing for Control Purposes." Id. at ¶ 16.

The RDU has three phases, and Phases I and II each have two subphases. Id. at ¶ 34. "Pursuant to the RDU Policies, Defendants Swink and Cothron, and other RDU staff, can, in their discretion, promote a prisoner to the next phase or subphase of the RDU or keep the prisoner in his current phase or subphase for as long as they deem appropriate." Id. at ¶ 36.

2

### 2. Restrictive Housing

Although Plaintiff describes Restrictive Housing as also involving "solitary-confinement-like conditions," he alleges that the RDU involves conditions that differ from and are "more limiting and inhumane than those in restrictive housing, especially during phases IA and IB." Id. at ¶ 52.

Specifically, Plaintiff alleges that prisoners do not receive any kind of notice, hearing, or written or verbal explanation regarding the decision to enroll them in the RDU. Id. at ¶¶ 25-27. In contrast, Plaintiff alleges that before a prisoner is placed in Restrictive Housing, he receives a hearing, during which he may present evidence and question witnesses, and a written explanation of the decision-maker's findings. Id. at ¶ 23.

Additionally, Plaintiff alleges that unlike Restrictive Housing, a prisoner may be in the RDU for an indefinite period of time. See id. at ¶ 28 (alleging that it takes a minimum of thirteen months to complete the RDU, although NCDPS policy does not set a maximum duration for how long a prisoner may spend in the RDU). Further, unlike Restrictive Housing, prisoners in the RDU "do not receive any kind of meaningful, recurring review of their continued confinement" in the program. Id. at ¶ 30; see also id. at ¶ 32.

With respect to particular conditions of confinement, Plaintiff acknowledges that both the RDU and Restrictive Housing require a prisoner to be alone in his cell for "at least" 22 hours each day. Id. at ¶ 53. Plaintiff also

3

acknowledges that the RDU and Restrictive Housing allow for the same limited amount of recreation, require a prisoner to eat meals in his cell, and limit a prisoner to two "no-contact" visitors every thirty days, and that prisoners in either the RDU or Restrictive Housing are prohibited from "covering their cell lights and windows, and their cells are brightly lit for more than 17 hours each day." Id. at ¶ 58. Plaintiff alleges, though, that unlike prisoners in Restrictive Housing, prisoners in the RDU are more limited in the personal property they are allowed to possess, have a time limit imposed on their meals, and are kept in full restraints when meeting with visitors. See id. at ¶¶ 53-58.

### 3. General Population Housing

Plaintiff also alleges that the RDU involves conditions that differ in multiple ways from the conditions in "general population" housing. See id. at ¶ 60.

Specifically, Plaintiff alleges that prisoners in general population housing are only required to be in their cells overnight or during "count times," are not restricted in their amount of recreation, and can eat outside of their cells. Id. at ¶¶ 61, 64-65. Additionally, prisoners in the RDU are "fully restrained and tethered" by cables to tables when participating in weekly group classes during certain subphases of the program, while prisoners in the general population are not restrained during group activities. Id. at ¶ 62. Finally, prisoners in the general population are allowed more frequent visitors,

4

Case 1:21-cv-00057-MR-WCM    Document 21    Filed 02/14/22    Page 4 of 20

who may stay for a longer duration, and these visits may be "contact or noncontact." Id. at ¶ 63.

### B. Plaintiff's Time in the RDU

Since approximately April 4, 2016, Plaintiff has been a prisoner in the custody of the NCDPS. Doc. 1 at ¶ 10.

Prior to December 9, 2017, Plaintiff was housed in the general population at Pasquotank Correctional Institution. Id. at ¶ 66. On or around December 9, 2017, Plaintiff was charged with an infraction. Id. at ¶¶ 67-68. Plaintiff subsequently pled guilty to the charge and his case manager submitted an internal request for Plaintiff to be placed in Restrictive Housing. Id. at ¶¶ 69, 70, 16.

Plaintiff alleges that he met with various prison personnel regarding his possible placement in Restrictive Housing on two occasions, but that no prison representative discussed the possibility that Plaintiff could be placed in the RDU. Id. at ¶¶ 71-72.

On or about January 24, 2018, Plaintiff was placed in Restrictive Housing and his review date (to determine whether he should remain in Restrictive Housing) was set for May 21, 2018. Id. at ¶¶ 73-74.

Sometime between January 24 and February 28, 2018, Swink, a Program Director in the RDU, and one of his former colleagues, Julie Jenkins (who is now deceased), saw that Plaintiff met the eligibility criteria for the

RDU. Id. at ¶ 75. After ensuring that there were no medical issues or central monitoring conflicts to prevent Plaintiff's enrollment in the RDU, Swink directed Population Management to transfer Plaintiff to the RDU. Id. at ¶¶ 76-78.

On March 2, 2018, Plaintiff was transferred to "Marion"[1] and enrolled in the RDU. Id. at ¶ 80.

Plaintiff alleges that he spent approximately 138 days in Phase I, approximately 184 days in Phase II, and approximately 76 days in Phase III of the RDU. Id. at ¶¶ 87, 109, 119.

During all of Phase I and most of Phase II, Plaintiff was given unsanitary mattresses and, as a result, developed a painful, itchy rash. He has received medical care for that condition, but it has persisted. Id. at ¶¶ 91-96, 117.

Plaintiff also alleges that during Phase I of the RDU, he nearly always spent at least twenty-two hours per day in his cell, received only one hour of recreation time, five times per week, and ate all his meals in his cell. Id. at ¶¶ 99, 101, 102. In addition, during that phase, Plaintiff could possess only two personal books or magazines, twenty sheets of paper, and limited hygiene products. Id. at ¶ 103. Tennis shoes were not permitted. Id. During the first 60 days of Phase I, Plaintiff could not make or receive any phone calls and, for the

---

[1] It appears Plaintiff is referencing the Marion Correctional Institution in McDowell County, North Carolina.

remainder of Phase I, Plaintiff could have one fifteen-minute call every thirty days. Id. at ¶¶ 105, 106.

Plaintiff was allowed one noncontact visit each month during his time in Phase I. Id. at ¶ 100. In Phase II, Plaintiff "was allowed two noncontact visits with immediate family or approved visitors every month." Id. at ¶ 114.

During all three phases, Plaintiff experienced bright lighting in his cell from 5:45 AM to 11:30 PM, which interfered with his sleep and radio reception. Id. at ¶¶ 97, 116, 123. Additionally, the library cart for books and magazines was not available while he was in the RDU, and during Phases II and III, Plaintiff had to request a form to allow him to use money from his trust account to purchase personal items from the canteen. Id. at ¶¶ 104, 115, 118, 124, 125.

Plaintiff graduated from the RDU program on April 4, 2019 and was transferred to "Bertie." Id. at ¶ 126.[2]

Plaintiff alleges that, due to the conditions in Phase I, he developed symptoms of PTSD, "including anxiety, feelings of hopelessness, and insomnia," and that he "continues to suffer serious injury, including a painful rash, severe anxiety, agitation, insomnia, hand sweats, emotional distress, feelings of hopelessness, and other symptoms of PTSD." Id. at ¶ 108, p. 25. He alleges that he did not receive notice, a hearing, or an opportunity to question

---

[2] At the time the Complaint was filed, Plaintiff was incarcerated at Bertie Correctional Institution. Doc. 1 at ¶ 10.

witnesses or be heard at any time as he progressed through the phases of the RDU. See id. at ¶¶ 88-90, 110-12, 120, 121.

### C. Plaintiff's Claim

Plaintiff seeks compensatory and punitive damages against Defendants based on a single claim that his due process rights under the Fourteenth Amendment were violated.

## III. Legal Standard

When considering a motion made pursuant to Rule 12(b)(6), the court, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff, determines "whether the complaint on its face states plausible claims upon which relief can be granted." Francis v. Giacomelli, 588 F.3d 186, 189, 192 (4th Cir. 2009); accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).[3]

The court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192. That is, while "detailed factual allegations" are not required, the complaint must contain "enough facts to state a claim to relief that is plausible

---

[3] Although Swink and Cothron have moved to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, they do not address the 12(b)(1) standard, or application of that standard, substantively in their briefing.

on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); accord Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); accord Consumeraffairs.com, 591 F.3d at 255. In short, the well-pled factual allegations must move a plaintiff's claim from conceivable to plausible. Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

IV. Discussion

In the Motion to Dismiss, the Moving Defendants argue that Plaintiff's claim is barred by res judicata, that his Complaint fails to state a claim, and that Swink and Cothron are entitled to qualified immunity.

A. Res Judicata

"The doctrine of res judicata, or claim preclusion, is applied to bar a suit in light of a prior judgment when three elements are demonstrated: (1) that 'the prior judgment was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process'; (2) that 'the parties are identical, or in privity, in the two actions'; and (3) that 'the claims in the second matter are based upon the same cause of action involved in the earlier proceeding'—*i.e.,* the claims 'arise out of the same transaction or series of transactions, or the same core of operative facts.'" Duckett v. Fuller,

9

819 F.3d 740, 744 (4th Cir. 2016) (quoting In re Varat Enterprises, Inc., 81 F.3d 1310, 1315-16 (4th Cir. 1996)).

Here, the Moving Defendants point out that Plaintiff has previously filed two suits similar to the instant matter – William Kimble v. Parks, et al., 5:18-ct-03133-FL, United States District Court, Eastern District of North Carolina ("Kimble I") and William Kimble, Jr, et al. v. Kenneth Lassiter, et al., No. 1:19-cv-00060-FDW, United States District Court, Western District of North Carolina ("Kimble II") – and argue that a prior judgment entered in Kimble II bars Plaintiff's claim.

### 1. Prior Actions: Kimble I and Kimble II

On June 6, 2018, while he was housed at the Marion Correctional Institution, Plaintiff filed his Complaint in Kimble I against Lt. Turley, Sgt. Barfield, "Ms. Parks" who was a member of the facility classification committee, and "Ms. Cordy" who was a case manager.[4] As described by the Hon. Louise Flanagan, the presiding District Judge in Kimble I, Plaintiff alleged that these individuals "violated his rights under the Fourteenth Amendment to the United States Constitution by transferring him from the

---

[4] This Court may take judicial notice of the content of the court records in Kimble I. See Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record."); see also Colonial Penn Ins. Co. v Coil, 997 F.2d 1236, 1239 (4th Cir. 1989) (noting "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records").

Pasquotank Correctional Institution ('Pasquotank') to the 'Rehabilitative Diversion Unit' at the Marion Correctional Institution ('Marion') without providing notice or an opportunity to be heard." Kimble I, Doc. 47 at 1.

On February 21, 2019, and while Kimble I was in progress, Plaintiff filed a separate case in this District. Kimble II, Doc. 1. On March 13, 2019, Plaintiff filed his Second Amended Complaint in Kimble II. Id., Doc. 17. That pleading named Swink, Corpening, Jenkins, and Cothron, as well as the Director of Prisons Kenneth Lassister, as defendants and asserted claims arising out of his transfer to a "highly restrictive facility" for a three-phase program without due process. Kimble II, Doc. 17 at 5.

On June 11, 2019, Plaintiff's Second Amended Complaint in Kimble II was dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Kimble II, Doc. 23. In that ruling, the presiding District Judge, the Hon. Frank Whitney, found that Plaintiff's Eighth Amendment and due process claims were insufficient to proceed. Kimble II, Doc. 23.

Approximately 17 months later, on November 10, 2020, Judge Flanagan entered an order granting Plaintiff's "Motion for Voluntary Dismissal Without Prejudice" in Kimble I. The court dismissed Plaintiff's claim "without prejudice only to the extent that plaintiff may file one new action in the Western District of North Carolina asserting Fourteenth Amendment due process claims against the Marion Correctional Institution officials responsible for his

11

transfer to the Rehabilitative Diversion Unit." Otherwise, Plaintiff's claims were dismissed with prejudice. Kimble I, Doc. 47 at 8.

### 2. The Preclusive Effect on the Instant Case

The Moving Defendants bear the burden of establishing res judicata. See United States v. McOuat, No. 5:16-CV-691-BR, 2017 WL 6503617, at *5 (E.D.N.C. Dec. 19, 2017) (internal citations omitted) ("Res judicata is an affirmative defense, and as such, the defendant bears the burden of proof"). For the following reasons, the undersigned is not persuaded that the Moving Defendants have carried their burden here.

First, and although not addressed in Plaintiff's response, it is not clear whether the dismissal of Kimble II pursuant Section 1915(e) should have any preclusive effect for purposes of the instant Motion to Dismiss, which is asserted pursuant to Rule 12. See Denton v. Hernandez, 504 U.S. 25, 34 (1992) ("Because a [§ 1915(e)] dismissal is not a dismissal on the merits, but rather an exercise of the court's discretion under the *in forma pauperis* statute, the dismissal does not prejudice the filing of a paid complaint making the same allegations. It could, however, have a res judicata effect on frivolousness determinations for future *in forma pauperis* petitions").

Additionally, subsequent to the dismissal of Kimble II, Judge Flanagan dismissed Kimble I without prejudice and allowed Plaintiff to "file one new action in the Western District of North Carolina asserting Fourteenth

12

Amendment due process claims against the Marion Correctional Institution officials responsible for his transfer to the Rehabilitative Diversion Unit." The Order dismissing Kimble I did not reference Kimble II.

Under these circumstances, the undersigned will not recommend dismissal on the basis of res judicata.

### B. Failure to State a Claim[5]

"There is no constitutional right for an inmate to be housed in a particular institution, at particular custody level, or in a particular portion or unit of a correctional institution." Torres v. Ishee, No. 1:21-cv-00068-MR, 2021 WL 5182103, at *3 (W.D.N.C. Nov. 8, 2021) (citing Sandin v. Conner, 515 U.S. 472, 484 (1995); Meachum v. Fano, 427 U.S. 215, 224 (1976)). Changes "in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison." Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991).

"As such, a prisoner does not have a right to due process before placement in a more restrictive housing placement unless the conditions

---

[5] Plaintiff's Complaint purports to names Cothron in his individual and official capacities. The parties, however, do not appear to interpret the Complaint as asserting official capacity claims.

impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Torres, 2021 WL 5182103, at *3 (quoting Sandin, 515 U.S. at 484 (citing Wolff v. McDonnell, 418 U.S. 539 (1974)); Wilkinson v. Austin, 545 U.S. 209, 210 (2005)). "This means that courts first must determine what 'the normative baseline is: what constitutes the "ordinary incidents of prison life"' for this particular inmate?" Covington v. Lassiter, 1:16-cv-387-FDW, 2017 WL 3840280, at *5 (W.D.N.C. Sep. 1, 2017) (quoting Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015)). "[T]he general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." Incumaa, 791 F.3d at 527.

Accordingly, "[w]hether confinement conditions are atypical and substantially harsh is a 'necessarily ... fact specific' comparative exercise." Torres, 2021 WL 5182103, at *3 (quoting Beverati v. Smith, 120 F.3d 500, 502-503 (4th Cir. 1997) (quoting Sandin, 515 U.S. at 483-84)).

With respect to the RDU in particular, numerous cases from this District – including Kimble II – indicate that an assignment to the RDU is insufficient to support a due process claim. See e.g., Covington, 2017 WL 3840280, at *6 (granting defendants' motion to dismiss and finding that "while the [RDU] condition described by Plaintiff may be more burdensome [than] those of a regular population inmate, they are not so atypical or significant that his

14

temporary exposure to them implicates a liberty interest"); Allen v. Mitchell, 1:18-cv-65-FDW, 2018 WL 4494988, at *3 (W.D.N.C. Sep. 19, 2018) ("Plaintiff does not allege any facts showing that the restrictions of the RDU program posed an atypical and significant hardship in relationship to the ordinary incidences of prison life"); Kimble v. Corpening, No. 1:19-cv-60-FDW, 2019 WL 2482883, at *4 (W.D.N.C. June 11, 2019) (Plaintiff "complains that he was sent to Marion C.I.'s RDU program instead of the restrictive housing that he expected. Plaintiff has failed to allege adequate facts showing that the RDU program posed an atypical and significant hardship in relation to the ordinary incidents of prison life under these circumstances"); James-Bey v. N.C. Department of Public Safety, 1:19-cv-20-FDW, 2019 WL 5198490, at *4 (W.D.N.C. Oct. 15, 2019); Torres, 2021 WL 5182103, at *3 (plaintiff "failed to plausibly allege that the RDU conditions are atypical or significant as compared with the conditions he would otherwise experience at a non-RDU prison").

Here, Plaintiff alleges that he was confined to his cell for 22 hours per day frequently; that he had limitations on visits, phone calls, recreational activities, personal items, hygiene products, and meals; that his cell was brightly lit for approximately 17 hours per day, and that he was restrained during group activities. Plaintiff additionally alleges that the RDU is of an indefinite duration. See Doc. 1 ¶ 28. However, he also alleges that it takes

15

prisoners a minimum of approximately 13 months to complete the program and acknowledges that he graduated from the program in approximately the same amount of time (400 days). See Doc. 1 at ¶¶ 28, 126. These allegations do not "constitute atypical and significant hardships in relation to the general population." See Moore v. Corpening, 1:18-cv-146, 2018 WL 4110547, at *11 (2018) (dismissing plaintiff's claim on initial review for failing to allege an atypical and significant hardship where plaintiff alleged limitations on privileges for books, radio, canteen, food packages, and hygiene products); Allen, 2018 WL 4494988, at *3 (dismissing plaintiff's claim on initial review for failing to allege an atypical and significant hardship where plaintiff alleged 23 hour per day lockdown and treatment worse than segregation despite classification as regular population).[6]

Finally, although Plaintiff alleges that he received an unsanitary mattress that caused a painful and itchy rash, Plaintiff has not brought an Eighth Amendment claim regarding his conditions of confinement and Plaintiff has otherwise alleged no facts to suggest that unsanitary mattresses are a part of the RDU as a matter of course.

The undersigned will therefore recommend dismissal on this basis.

---

[6] Further, Plaintiff alleges that he was provided with process prior to being designated for Restrictive Housing. Doc. 1 at ¶ 16. Even if placement in the RDU did trigger due process rights, Plaintiff received process before he was assigned to Restrictive Housing, a classification that appears to be similar to the RDU.

16

### C. Qualified Immunity

"Qualified immunity may be invoked by a government official sued in his personal, or individual, capacity." Ridpath v. Board of Governors Marshall University, 447 F.3d 292, 306 (4th Cir. 2006). "Government officials are entitled to the defense of qualified immunity unless a § 1983 claim satisfies the following two-prong test (the 'qualified immunity test'): (1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a 'clearly established' right 'of which a reasonable person would have known.'" Id. (citing Mellen v. Bunting, 327 F.3d 355, 365 (4th Cir. 2003)).

A clearly established right is one that "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Armstrong v. Village of Pinehurst, 810 F.3d 892, 907 (4th Cir. 2016) (internal quotations omitted). The Moving Defendants bear the burden of proving that they are entitled to qualified immunity. Dennis v. Sparks, 449 U.S. 24, 29 (1980).

As discussed above, courts in this District have dismissed numerous cases brought by inmates concerning the RDU. See e.g., Covington, 2017 WL 3840280, at *6; Allen, 2018 WL 4494988, at *3; James-Bey, 2019 WL 5198490, at *4. Plaintiff argues that factually analogous cases exist and that those cases provided Defendants with fair notice that their conduct was unlawful. Doc. 19

at 21–22 (citing <u>Wilkinson v. Austin</u>, 545 U.S. 209 (2005) (finding a protected liberty interest in avoiding assignment to a supermax facility in part due to the indefinite duration of the assignment). However, the case law from this District supports the Moving Defendants' entitlement to qualified immunity, and Plaintiff does not cite any controlling authority to the contrary.

Therefore, the undersigned will recommend, in the alternative, that the Moving Defendants' Motion to Dismiss be allowed on the basis of qualified immunity.

### D. Claims Against Corpening

Defense counsel states that "[e]ven though [he] does not represent Defendant Corpening, all arguments herein would be equally applicable to him. Thus, to the extent the Court grants this Motion, the Court may want to consider *sua sponte* dismissing the claims against Defendant Corpening as well." Doc. 18 at 1, n. 1.

Although Plaintiff has named Corpening as a defendant, there is nothing in the record to indicate that Corpening has been served. The undersigned has considered whether to recommend that Plaintiff be advised that unless good cause is shown for his failure to effect service on Corpening, Plaintiff's action against him may be dismissed without prejudice. <u>See</u> Fed. R. Civ. P. 4(m). However, as the recommendations discussed above with respect to the Moving Defendants would apply equally to Corpening, in the interest of judicial

economy, the undersigned will recommend disposition of the claim against Corpening on the same basis.[7]

V.      Recommendation

For the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that the Motion to Dismiss (Doc. 17) be **GRANTED,** and Plaintiff's claim against Defendants be **DISMISSED**.

Signed: February 14, 2022

W. Carleton Metcalf
United States Magistrate Judge

---

[7] Plaintiff's Complaint also purports to names Corpening in his individual and official capacities.

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636, and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).